William A. HOLLADAY et al., Appellants and Cross-Appellees,

v.

PEABODY COAL COMPANY et al., Appellees and Cross-Appellants.

Joe GRIDER et al., Appellants and Cross-Appellees,

v.

PEABODY COAL COMPANY et al., Appellees and Cross-Appellants.

Supreme Court of Kentucky.

Nov. 18, 1977.

Rehearing Denied Jan. 31, 1978.

E. F. Martin, Jr., Hartford, William M. Gant, William T. Carroll, Gant & Carroll, Owensboro, for appellants and cross-appellees.

Sam T. Jarvis, Greenville, Clarence Bartlett, Bartlett, McCarroll & Nunley, Owensboro, for appellees and cross-appellants.

STERNBERG, Justice.

These actions were filed in the Ohio Circuit Court by the Peabody Coal Company. It sought to acquire a 50-foot permanent easement for constructing and maintaining a roadway and an overhead coal conveyer system over a portion of the lands of appellants from a mine opening not located on appellants' properties.

On these appeals and cross-appeals the issues are the same in both cases; accordingly, we will dispose of the issues with a single opinion. The Peabody Coal Company and the Beaver Dam Coal Company, who was permitted to intervene in each case and whose position is compatible with that of Peabody Coal Company, will be collectively referred to as "Peabody" throughout this opinion. In appeal number 75–673 the appellants are William A. Holladay and others, whose interests are likewise compatible. They will be collectively referred to as "Holladay." The appellants in appeal number 75–659 are Joe Grider and others, whose interests are also compatible. They will be collectively referred to as "Grider."

In the original petitions filed on January 21, 1972, Peabody, pursuant to KRS 277.040 and 416.410 to 416.520, charged that it is authorized to condemn a permanent easement in order to transport its mined products from the mine to the most convenient and accessible point to the Louisville & Nashville Railroad tracks. Several amendments were filed to the petitions. However, on July 15, 1972, Peabody filed an amendment in each case which materially changed its cause of action. In this amendment it charged that it, Holladay and Grider, respectively, acquired title to and interest in the land sought to be utilized from common sources. It asserts that it has record title to, owns, and has the right to utilize the surface of the subject lands of Holladay and Grider for its stated purposes; that Holladay and Grider refused to permit it access to their properties; and that they are slandering its title. Peabody demands to have its ownership and right of usage quieted and to have Holladay and Grider permanently enjoined from interfering with its desired usage of the subject property. In the alternative, however, Peabody demands that in the event its ownership of the surface rights is denied by the court, it should be permitted to condemn the land as sought in its original petition.

Not only was Peabody's title to the surface rights put in issue, but the existence of facts necessary to justify the eminent domain proceeding also was put in issue. Holladay and Grider pleaded affirmative defenses, which, if sustained, would deny Peabody the relief it seeks. One defense of particular significance is that there has been a complete and absolute abandonment of mining operations upon the premises and in the vicinity of the premises which are the subject of these actions, as a result of which all of the rights, privileges and easements

granted by their common grantor have reverted and are lost to Peabody.

Procedural scuffles before the trial court need not be dealt with, other than those about which comment will be made.

On September 18, 1972, the trial judge entered interlocutory orders wherein he determined that, (1) Peabody has a right, pursuant to the designated statutes, to maintain these eminent domain actions; (2) the subject statutes do not violate sections 12 and 242 of the Kentucky Constitution or the related sections of the Constitution of the United States; and (3) pursuant to payment of the amount of money awarded by the court commissioners, Peabody could take immediate possession of and utilize the Holladay and Grider properties for the described purposes. This order (September 18, 1972) is conspicuous by the fact that no finding was made "that there is no just reason for delay." CR 54.02. On December 15, 1972, nearly two months after the notice of appeal was filed in the Ohio Circuit Court, the trial court entered an order attempting to correct and modify the order of September 18, 1972, by adding the phrase "and the court now determines, pursuant to CR 54.02, that there is no just reason for delay." Holladay and Grider filed their notices of appeal from the orders of September 18, 1972, on October 17, 1972. The appeals were styled *William A. Holladay and Lucille Holladay, et al. v. Peabody Coal Company* (No. 73–67) and *Joe Grider and Bertha Santale Grider v. Peabody Coal Company* (No. 73–68). Motions to dismiss the appeals were filed in this court by Peabody, and on May 10, 1973, in granting the motions, this court entered an order in each case providing in part as follows:

"The court is of the opinion that the order appealed from in each case entered on the 18th day of September, 1972, is not a final order or judgment and is therefore not appealable.

The court is further of the opinion that an order entered in each case on December 1, 1972, which purported to modify and correct the order appealed from by adding the finding that there was no just reason for delay, did not relate back to the entry of the original order.

The question of whether the December 1, 1972, order was a nullity and if not, what legal effect it had, is not before us since no appeal has been attempted from that order, nor do we reach the question of whether the right to take in a condemnation proceeding is a separable claim under CR 54.02."

Thus endeth the former appeals.

These present appeals and cross-appeals are from judgments of the Ohio Circuit Court dated March 5, 1975, pursuant to Peabody's motions for summary judgments. We construe the judgments to provide that:

1. Peabody and Beaver Dam Coal Company are the owners of the coal and other minerals in, on and under the land described in deeds to Peter O. McKinney dated May 4, 1908, and recorded in the office of the County Court Clerk of Ohio County, Kentucky, in deed book 32, at pages 363 (Holladay) and 357 (Grider).

2. Predicated on a finding that the use of the subject property for mining purposes had been abandoned, the trial court adjudged that certain mining privileges and rights granted in the subject deeds had been lost.

3. As owners of the coal and other minerals, however, Peabody and Beaver Dam do have such rights to mine and remove the coal as may be implied by law from their ownership.

In other words, the trial judge held that even though Peabody is the owner of the coal and minerals, it only has such rights to mine and remove them as are granted to it by implication of law, it having lost the rights and privileges granted to it in the deeds by reason of abandonment.

Holladay and Grider contend that the trial court erred in separating the nonreversion of the ownership of the coal and other minerals from the reversion of the rights and privileges to the use of the surface as set out in the deeds. They contend that both reverted and were lost to Peabody. On the other hand, Peabody complains of the court's findings that, (1) there has been

an abandonment of the mining operations, and (2) the rights granted by the subject deeds have been lost to it.

The titles of Peabody, Holladay and Grider in and to the subject tracts of land came from a common grantor, Peabody having acquired the coal and other minerals and Holladay and Grider having acquired the surfaces.

### Holladay-Peabody Deed

Cortez P. Brown was the owner of not only the surface but also the underlying minerals in a 157.28-acre tract of land in Ohio County, Kentucky. On May 4, 1908, Brown conveyed all of the coal, other minerals and certain specified surface rights and easements to Peter O. McKinney by deed of record in the office of the County Court Clerk of Ohio County, Kentucky, in deed book 32, p. 363. Hereafter, this conveyance will be referred to as the Holladay deed.

Peabody is a remote vendee of the minerals and certain surface rights and easements through the McKinney deed. Holladay, other than Ohio Valley Oil & Gas Company, is the remote vendee of the surface through mesne conveyances from Brown.

### Grider-Peabody Deed

Clinton S. Rowe was the owner of not only the surface but also the underlying minerals in a 39.84-acre tract of land in Ohio County, Kentucky. On May 4, 1908, Rowe conveyed all of the coal, other minerals and certain specified surface rights and easements to Peter O. McKinney by deed of record in the office of the County Court Clerk of Ohio County, Kentucky, in deed book 32, p. 357. Hereafter, this conveyance will be referred to as the Grider deed.

Peabody is the remote vendee of the minerals and certain surface rights and easements through the McKinney deed. Grider is the remote vendee of the surface through mesne conveyances from Rowe.

These appeals and cross-appeals involve identical mineral deeds which Peabody seeks to have construed so as to permit it to construct the overhead coal conveyer system without first securing consent from Holladay and Grider. The right to utilize the surface of the Holladay-Grider lands, in keeping with the McKinney deeds, is lost if there was an abandonment; if not, then it becomes necessary to apply the four-corner rule of construction so as to determine whether the deeds are subject to the construction affixed to them by Peabody. It, therefore, behooves us to talk about whether there has been an abandonment as defined in the McKinney deeds.

After talking about the rights, privileges and easements which were to run with the lands, the deeds provide that " * * * to the said Peter O. McKinney, his heirs and assigns forever, so long as he, or they, shall operate a mine or mines under said premises, or under premises adjoining, or in the vicinity thereof; temporary suspension of mining operations shall not work a forfeiture of said rights, but upon complete and absolute abandonment of mining operations by the said Peter O. McKinney, his heirs and assigns, in the vicinity of said premises, the rights, privileges and easements herein granted shall revert to the grantor, his heirs or assigns. * * * "

■ Abandonment was put in issue by Holladay and Grider and the burden of proving it was with them. Their counsel, in his brief, advises us that counsel for Peabody admits that there has been an abandonment, but this charge is vigorously denied by counsel for Peabody, who affirmatively states that there has been no abandonment. The only other place in the record where the subject of abandonment is mentioned is in the trial court's opinion. Therein it is written:

"Insofar as this Court has been able to determine, the record is silent as to whether there is or ever has been any mining operations on this property, however, all parties appear to agree in their briefs that there has been no mining activity on the property for over thirty years and the Court in disposing of this matter assumes this to be true."

These actions came before the trial judge on Peabody's motions for summary judgment. In such posture, the inquiry of the trial court was whether a genuine issue of material fact existed as to whether, under the terms of the subject deeds, a nonuser for a period of thirty years or a failure to commence mining operations constitutes abandonment. The reversion of the rights, privileges and easements in the subject deeds is predicated upon a complete and absolute abandonment of mining in the vicinity. Apparently it is undisputed that the record is silent as to whether there is or ever has been any mining operation on these properties. There have been no mining activities on the properties for over thirty years. As to the former, the proposition is posed as to whether there can be an abandonment of mining operations where no mining operations were ever commenced. Since abandonment was pleaded by Holladay and Grider and the record is silent as to whether there ever has been mining operations on the properties, there was a failure of evidence to support any finding of abandonment, and we do not reach the question of whether there can be an abandonment of mining operations where no mining operations were ever commenced. A finding to the contrary would have been clearly erroneous. As to the latter, the trial court determined that since there had been no mining activities on the properties for over thirty years, this was sufficient evidence to support a finding that there had been a complete and absolute abandonment of mining operations in the vicinity of the subject properties. Consequently, the reverter clause as to the special rights, privileges and easements became effective.

■ We must ask ourselves: Does the simple failure of Peabody to commence mining operations for thirty years constitute an abandonment, not only failure to operate a mine on the subject premises, but failure to operate a mine in the vicinity? We must either fix an arbitrary number of years that constitutes abandonment or look at the surrounding circumstances and let each case stand on its own bottom. Equity

does not permit the former. As to the latter, when attempting to ascertain the intention of the parties to a mineral deed, the court must consider the situation and circumstances which existed when the deed was made. *Martin v. Kentucky Oak Mining Company*, Ky., 429 S.W.2d 395 (1968). Also, the same result is reached when we carefully scrutinize *Bardhill v. Sellers*, Ky., 298 S.W.2d 5 (1956). Therein, this court held that there had been an abandonment where there had been a failure for more than fifty years to cause a reasonable development of oil and gas. This result was reached, however, when we considered the circumstances surrounding, and the consideration for, the execution of the mineral deed. We call attention to the fact that the consideration for the conveyance was the agreement to transfer 43 shares of fully paid up and nonassessable capital stock, of the par value of $100 each, of Owensboro Hawesville Gas & Mineral Company to the grantor, which was not done. We further noted that two years after the conveyance, the mining company became insolvent, made an assignment of its assets, and was dissolved. We affirmed the proposition that "in the case of a conveyance of mineral rights, an implied condition of reasonable development will be read into the conveyance, unless there is an immediate valuable consideration paid to the grantor, as distinguished from a consideration dependent solely upon the election of the grantee as to future activity."

■ In the case at bar, there is no evidence that the consideration for the conveyance was not fully satisfied or, as a matter of fact, that there remains anything yet to be done to fully satisfy that consideration. The trial court found that there was an outright sale of the coal and other minerals. We concur. As such, we recognize that a sale and conveyance of minerals in place is a severance of the title as to that part of the realty. *Kentucky Bank & Trust Co. v. Ashland Oil & Transp. Co.*, Ky., 310 S.W.2d 287 (1958). Being the owner of the coal and other minerals, Peabody was under no duty to mine them, unless, of course, there was

some compulsion contained in the deed. This court can, and does, take judicial cognizance of the fact that there are many reasons why a particular tract of coal is mined or not mined. For example, did Peabody own other lands in the vicinity that could be mined? Was Peabody operating other mines in the vicinity? Was the market price of coal such as to warrant its mining? Were the physical surroundings such as to induce going after the coal? Had engineering studies and assurances been received that there was coal in sufficient quantity and quality to justify its being mined? Were explorations being made that would affect mining on the subject property? So, on and on.

We cannot concur with the trial court that since there had been no mining activities on the subject property for over thirty years there was an abandonment as contemplated by the mineral deeds. Having determined that there was no abandonment of mining operations, it necessarily follows that there was no reversion of the rights, privileges or easements.

Having disposed of the reversion issue contrary to the contention of Holladay and Grider, we now reach the issue of whether the mineral deeds are subject to an interpretation sufficiently broad so as to permit Peabody to construct a conveyer system upon and over the lands of Holladay and Grider for the purpose of moving coal from the mine to the transportation point on the Louisville & Nashville Railroad. The trial court did not reach this issue since there was a finding that the rights, privileges and easements set out in the mineral deeds had been lost to Peabody.

As heretofore stated, the judgments from which these appeals and cross-appeals are taken came about by reason of the trial court's action on Peabody's motions for summary judgment. We have written many times, and we again reaffirm that position, that summary judgments must be cautiously granted and that the summary-judgment procedure is not a substitute for a trial. Where it is perfectly clear that there is no dispute as to the evidentiary facts in a case but only as to the legal conclusions to be drawn therefrom, a summary judgment is proper. *Rowland v. Miller's Adm'r*, Ky., 307 S.W.2d 3 (1957).

The subject deeds speak for themselves, to which we need only apply the law. We choose, therefore, to give the deeds a four-corner examination and to dispose of the issue. For Peabody to sustain its right to relief by the terms of the Holladay and Grider deeds, it must be shown that the deeds expressly vest that right in it or its predecessors in title through whom it claims. *Marlowe v. Marcum*, Ky., 294 Ky. 405, 171 S.W.2d 997 (1943); *Wiser Oil Company v. Conley*, Ky., 346 S.W.2d 718 (1961).

To ascertain what the parties meant by what they wrote, we must try to place ourselves in their shoes. We then, psychologically, substitute ourselves for the contracting parties and take into effect the social and economic conditions of the times and of the parties, the usual practice of the trade, the familiarity of the parties with the subject matter, and the education and business advantages of the parties.

The rights, privileges and easements which are set out in the subject deeds may be paraphrased as follows: First, there is a reference to air shafts, drains and waterways necessary to the operation of a mine. Next, there is a grant of authority to erect electric wiring necessary in the operation of a mine. Then, there is a grant of a convenient right-of-way for the purpose of performing or carrying out the erection of the electric wires and the construction, operation or erection of air shafts, etc. Thereafter follows a grant to transport coal from the subject land, adjacent lands or other lands in the vicinity through any entries in and under the subject premises. Next follows a right to drain water from mines being operated on the subject premises. There is a disclaimer of liability for damages in carrying out the rights, privileges and easements therein set out. The next and most significant grant or a right or privilege, as it affects the present issue, is:

"PROVIDED, HOWEVER, that if the said Peter O. McKinney, his heirs or assigns shall desire to use the surface of any portion of the land hereinabove specifically described, for the purpose of constructing, erecting and operating any platforms, roads, railroads, switches, side-tracks, machinery, tipples, chutes, buildings and other structures, as he or they may deem necessary or convenient to facilitate the mining and removal of said coal or other minerals, he or they, before using such surface, shall purchase the land, the surface of which he or they shall desire to use, under the option and privilege of purchase hereinbefore contained, * * * "

As has been heretofore pointed out, the mine from which the coal is proposed to be taken is not on either the Holladay or Grider tracts but from a mine which has its opening on a tract of land separate and apart from the Holladay and Grider tracts. The "said coal or other minerals" refers to the coal and minerals located on the subject Holladay and Grider tracts. The rights and privileges for which the surface of the Holladay and Grider tracts may be used by Peabody are limited to the coal or other minerals located in the subject lands and taken from an opening on the subject lands. Since the mine in the present actions is not on either the Holladay and Grider tracts and the right to utilize the surface of these lands is limited to the mining and removal of coal or other minerals taken from these tracts, the subject deeds do not confer on Peabody any right to utilize the surface, as it herein seeks to do, without the consent of Holladay and Grider. The deeds appear to have been prepared by a person experienced in drafting such instruments. The references in the deeds to "premises," "adjoining," "in the vicinity of," "right to erect convenient right-of-ways over the surface," and "transport coal from the above described" are indicative of the fact that the documents clearly say what the parties wanted them to say.

The judgments of the Ohio Circuit Court, from which these appeals and cross-appeals are taken, are:

1. Affirmed insofar as they decree Peabody to be the owner of the coal and minerals in, on and under the lands described in the pleadings by virtue of the deeds to Peter O. McKinney dated May 4, 1908, and recorded in the office of the County Court Clerk of Ohio County, Kentucky, in deed book 32, at pages 363 (Holladay) and 357 (Grider).

2. Reversed insofar as they decree an abandonment of the mining operations.

3. Reversed insofar as they decree a reversion of the rights, privileges and easements contained in the said deeds.

These cases are remanded to the Ohio Circuit Court for the entry of judgments consistent with this opinion.

All concur.